UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JENNIFER A. TOTTEN,                                    :

                        Plaintiff,            :

                -against-            : **REPORT AND RECOMMENDATION**

                             :     10 Civ. 01410 (BSJ)(KNF)

MICHAEL J. ASTRUE, Commissioner of Social
Security,                                              :

                     Defendant.            :
------------------------------------------------------------X
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE BARBARA S. JONES, UNITED STATES DISTRICT JUDGE

## BACKGROUND

      Plaintiff Jennifer A. Totten ("Totten") brought this action, pursuant to the Federal Old-Age Survivors and Disability Insurance Benefits ("DIB") program of the Social Security Act ("SSA"), 42 U.S.C. §§ 401-434, as amended, and the Supplemental Security Income for Aged, Blind, and Disabled ("SSI"), 42 U.S.C. §§ 1381-1383f, as amended, to obtain judicial review of the final determination of the Commissioner of Social Security (the "Commissioner"), denying her application for DIB and SSI. The Commissioner filed an answer. Subsequently, he made a motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Totten filed a cross-motion for judgment on the pleadings.

***Procedural History***

      On September 21, 2007, Totten filed, protectively, applications for DIB and SSI. (Tr. 9). Totten's applications were denied on March 3, 2008. (Tr. 49-52). She appeared for a hearing before an administrative law judge ("ALJ") on June 10, 2009. (Tr. 20-46). On September 11,

2009, the ALJ issued his decision finding Totten not disabled under SSA.  (Tr. 9-19).  The Social Security Administration Office of Disability Adjudication and Review denied Totten's request for a review of the ALJ's decision, on December 23, 2009.  (Tr. 1-3).  This action followed.

***Non-Medical Evidence***

Totten was born in 1978. (Tr. 98).  Totten stated, during her interview with the agency that, since June 1, 2006, due to bipolar disorder, manic depression, anxiety and the "effects of [a] car accident" she is disabled, and that she "stopped working because [she] was pregnant."  (Tr. 118).  She testified at the administrative hearing that she actually stopped working in April 2006 and that she gave birth to a child on June 15, 2006.  (Tr. 23).  At the time of the administrative hearing, in June 2009, Totten lived with her three children, who are three, six and twelve years old.  (Tr. 23-24).  Totten testified that she was not able to return to work, after she had a child in June 2006, "because [her] daughter got sick and she ended up getting [a respiratory disease]" and "for two years she had to have shots in her legs."  (Tr. 24).  Totten testified that one of her sons has chronic asthma, and her "other son has epilepsy" and "[t]hey both have [attention deficit hyperactivity disorder]."  (Tr. 28).  At the time of the hearing, Totten stated she weighted 328 pounds.  (Tr. 44).  Totten is 5'7" tall.  (Tr. 117).

She indicated in her application for benefits that she worked as a: (1) cashier for a gas station convenience store and Walmart, from 2000-2006; (2) housekeeper for a hotel, in 1998; and (3) waitress in a pizzeria, from 1995 to 1997.  (Tr. 119).  As a cashier, she stood for six hours and walked for two hours daily, she lifted boxes of merchandise weighing between five and thirty pounds for about one hour per day, on average, and the heaviest weight she lifted was fifty pounds.  (Tr. 119).  As a housekeeper, Totten cleaned rooms and did laundry, lifted objects weighing less than ten pounds, walked, stood, climbed, kneeled, crouched and handled or

2

grasped big objects daily.  (Tr. 154).  As a waitress, she washed dishes, used a cash register and all kinds of utensils, carried a tray, walked and stood for about six to seven hours daily, crouched for about an hour per day and had to handle, grab or grasp big objects and write, type and handle small objects all day.  (Tr. 153).  As a waitress, the heaviest load she lifted was twenty pounds, and she frequently lifted less than ten pounds.  (Tr. 153).  She also worked as a bus aid, assisting small children on and off the bus.  (Tr. 156).

At the time of her application for benefits, Totten took care of her children, attended to her personal needs, prepared meals, although her mother and friends sometimes prepared meals for her, shopped for household items, did light, basic household chores and "manage[d] doing everything but sometimes [it was] hard to do it due to [her] depression/and [medications]."  (Tr. 142-144, 151).  When she traveled to her or her children's medical appointments, Totten used public transportation or rode in a car.  (Tr. 144).  Her hobbies and interests included spending time with her children, reading, playing games, listening to music, drawing, writing poetry and talking on the telephone.  (Tr. 145).  She attended church on sundays and drug and alcohol and parenting classes regularly.  (Tr. 146).  However, at times, she was withdrawn, wanted to sleep and could not talk with others, especially if she did not take her medications, and she was easily distracted.  (Tr. 146-147).  Totten was able to walk for about one-half mile before she needed to rest, for about one-half hour, before she could continue walking and she could stand fifteen minutes, at one time, before her back starts hurting.  (Tr. 39, 147).  Sometimes, Totten could not sit too long because her back hurt her and she had problems sleeping at night, so she would take sleep medication.  (Tr. 39-40).  When affected with stress or schedule change, Totten would be overwhelmed and, sometimes, she would have trouble remembering.  (Tr. 148).  When she applied for benefits, Totten was taking Vistaril, Effexor, Endocet, Hydrochlorothiazide, Hydroxy

3

2 and Pseudoephedrine.  (123, 150).

***Medical Evidence***

On July 27, 2005, Totten sought treatment at Catskill Orthopaedics, PC ("COO") for an inversion injury to her left ankle that she sustained when she stepped away from a cash register where she worked.  (Tr. 205).  The examination showed a left ankle sprain and no evidence of acute bony abnormality or fracture.  (Tr. 206).  It was recommended that she return to work in one week, on light duty.   (Tr. 206).  On August 10, 2005, Totten returned to COO for a follow-up visit, when it was noted that she had been continuing to work full duty because Totten's employer was unable to provide light duty work for her.  (Tr. 204).  She continued to have pain laterally and was swelling in the area of her left ankle.  (Tr. 204).  Totten was given a prescription for a slip-on ankle support and continued to await approval for physical therapy.  (Tr. 204).  On October 5, 2005, Totten was seen by a family nurse practitioner, Michael Rollin ("Rollin"), in connection with a sore throat and cough; was diagnosed with upper respiratory infection and sinusitis; and was prescribed Tylenol, as needed, fluids and extra rest.  (Tr. 303).  On May 23, 2006, Totten presented at Catskill Regional Callicoon Campus and was diagnosed with constipation.  (Tr. 223).

On January 12, 2007, Totten reported to Catskill Medical Center because she was involved in a car accident.  (Tr. 312).  X-rays of her left knee, left arm and right lower leg were negative and she was diagnosed with skin abrasion and leg contusion.  (Tr. 312-313).  On January 17, 2007, Totten was seen by Rollin and complained about swelling and pain in her right lower extremity with bruising.  (Tr. 302).  Rollin noted a 22 cm bruise to her right inner calf, "pain with homans," "dp present," and "10 cm ecc[h]ymosis to left elbow."  (Tr. 302).  She was: (a) assessed with a leg contusion; (b) recommended Doppler testing of her right lower extremity;

4

and (c) prescribed Percocet.  (Tr. 302).  On January 29, 2007, after the Doppler test was

negative, Rollin noted Totten was still with ecchymosis to her right leg, she had full range of

motion, "dp present" and pain to her shin.  (Tr. 301).  She was assessed with a leg contusion,

prescribed Motrin three times daily and referred to an orthopedist.  (Tr. 302).  On February 7,

2007, Totten was seen by a certified family nurse practitioner, Sam Berger ("Berger"), who

noted that she complained about a pain in her right lower leg and requested pain medication.

(Tr. 300).  The examination showed Totten was in moderate pain, her right knee was tender

medially and she had a large hematoma in her right medial lower leg.  (Tr. 300).  Berger

assessed her with right knee pain and hematoma of the right lower leg.  (Tr. 300).  He  prescribed

Percocet and referred her to consult with an orthopedist and obtain a magnetic resonance

imaging test ("MRI").  (Tr. 300).

On March 9, 2007, Totten had an initial visit with an orthopedist, Dr. Charles A. Peralo

("Dr. Peralo").  (Tr. 202).  He noted significant swelling and severe ecchymosis throughout the

right lower extremity from the knee down.  (Tr. 202).  The examination showed that Totten had

significant pain along both compartments of the knee and significant discomfort and swelling in

the right ankle.  (Tr. 202).  Dr. Peralo found that x-rays did not show a fracture but that Totten

could not stand on the leg, which he concluded may be due to an occult fracture, soft tissue

injury or possible meniscal damage.  (Tr. 202).  He recommended an MRI of the right ankle and

right knee and noted that Totten "is out of work in the interim."  (Tr. 202).

On March 13, 2007, Totten visited Rollin complaining she was still in pain and started

having headaches, for which she was taking medication.  (Tr. 299).  Rollin noted Totten had

"pain to right knee to media aspect" and ecchymosis to right calf, which was painful to touch.

(Tr. 299).  She was assessed with headache and knee pain, recommended continued treatment

5

with her orthopedist and prescribed Percocet and hydrochlorothiazide.  (Tr 299).  On the same

day, Rollin noted that Totten had hypertension, as well as that she was compliant with her

medication intake.  (Tr. 298).

On March 15, 2007, Totten underwent MRI scans of her "right tibia/fibula" and right

knee.  (Tr. 307-308).  The MRI of the tibia/fibula showed "[p]retibial soft tissue swelling

without collection or hematoma," no evidence of fracture or bone marrow edema and no mass

was identified.  (Tr. 307).  The MRI of the right knee showed "pre-patellar bursitis" and "a small

amount of supra-patellar joint fluid" but no evidence of a fracture or bone marrow edema.  (Tr.

308).

On April 3, 2007, Totten was seen in the emergency room of the Catskill Regional

Medical Center ("CRMC"), after she had been assaulted and punched several times.  (Tr. 314).

She complained of right ear pain and decreased hearing and she had scratches to the left side of

her neck.  (Tr. 314).  Totten was diagnosed with tympanic membrane perforation.  (Tr. 315).

On April 10, 2007, Totten was seen by Rollin, who noted she requested medication for

the pain in her right inner ear.  (Tr. 296).  Rollin noted pain at her right inner mid tibia area and

"right ear 5 clock small open area."  (Tr. 296).  He assessed leg pain and tympanic membrane

perforation, referred her to an ear, nose and throat specialist as well as for a follow-up visit with

the orthopedist and prescribed Vicoden twice daily.  (Tr. 296).  On July 2, 2007, Totten was seen

by Rollin who noted she complained of left side headache and nasal congestion.  (Tr. 295).  She

was assessed with sinusitis and prescribed Bactrim, Sudafed and Percocet.  (Tr. 295).

On July 23, 2007, Totten was diagnosed, by social worker Hope Silverman

("Silverman"), with bipolar disorder "depressed type 296.53" and assessed global assessment

function ("GAF"[1]) 51.  (Tr. 209).  Silverman's opinion was signed by her supervisor, Donna

Schick ("Schick").  (Tr. 209).  On the same day, Totten was admitted to CRMC with a diagnosis

of "depression/suicidal ideation."  (Tr. 231).  At the hospital, Totten was started on Effexor

daily.  (Tr. 232).  In her discharge summary, Dr. Phone Win ("Dr. Win") diagnosed her with

"Bipolar disorder type 1, current episode depression" and "Bronchial asthma, injury to the leg

secondary to a motor vehicle accident," indicating, under the rubric for social stressor,

"Disability secondary to a motor vehicle accident, domestic violence and her boyfriend is in

jail."  (Tr. 232).  Dr. Win noted that, at the time of admission, Totten's GAF was 30-35.  (Tr.

235).  On July 24, 2007, Totten underwent a psychological assessment at CRMC and admitted

using alcohol the previous day.  (Tr. 244).  She was discharged from CRMC on her request on

July 27, 2007, because she was not suicidal or homicidal and she needed to take care of her

children.  (Tr. 232).  At the time of discharge, she was stable and her GAF was 45-50.  (Tr. 233).

On August 13, 2007, Totten underwent an initial psychiatric evaluation by Dr. Nambi

Salgunan ("Dr. Salgunan"), who diagnosed her with major, recurrent depression.  (Tr. 213).  On

August 15, 2007, Totten saw a family nurse practitioner, Heidi Pavese ("Pavese"), who noted

that Totten complained she had headaches on the left side since January, leg and knee pain and

high blood pressure.  (Tr. 294).  She was assessed with headaches and hypertension and

---

[1]

    The GAF is a scale promulgated by the American Psychiatric Association to assist
in tracking the clinical progress of individuals with psychological problems in global
terms.  A GAF between 51 and 60 indicates moderate symptoms (e.g., flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social,
occupational or school functioning (e.g., few friends, conflicts with peers or co-
workers).

Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (internal quotation marks, alterations
and citation omitted).

prescribed Percocet and hydrocholothiazide. (Tr. 294). On August 29, 2007, an "MD Note"

indicated Totten was under stress because of the relationship with her mother. (Tr. 215). On

September 18, 2007, Pavese noted that Totten complained of a soar throat and right ear pain, still

had headaches and pain in her right ankle. (Tr. 293). Totten reported she "fell off 4wheeler

9/15" and the left side of her face was swollen and bruised. (Tr. 293). She was assessed with

facial contusions, upper respiratory infection and asthma, referred for an MRI of ankle,

computerized tomography ("CT") scan of facial bones and sinus and referred to a pain specialist

and an orthopedist. (Tr. 293). She was prescribed Percocet and Ventolin. (Tr. 2993). An "MD

Note," signed by "Dr. Emmanuel," dated September 26, 2007, indicated that Totten had a major

depressive disorder and personality disorder and prescribed medication. (Tr. 217).

On October 1, 2007, Silverman updated her July 23, 2007 evaluation of Totten, which

her supervisor Schick also signed. (Tr. 330-334). Silverman recommended, inter alia,

individual therapy at least two times per month, return of her children to her full care and

custody, continuous treatment at the Sullivan County Mental Health Clinic, completion of her

parenting classes and continuous work with various agencies with which she is involved "until

she receives a positive discharge from all agencies." (Tr. 333). Totten's diagnosis was major

depressive disorder recurrent with psychotic features, pain in her leg from the car accident in

January 2007 and multiple stressors, including loss of custody of two older children, housing

issues and a history of abuse. (Tr. 333). Her GAF was 51. (Tr. 333). An "MD Note," dated

October 30, 2007, noted Totten's history of bipolar disorder, borderline personality disorder and

that she requested medication because it was helpful to her. (Tr. 218). Effexor and Vistaril were

prescribed. (Tr. 218). On November 5, 2007, Totten was seen by Berger who referred her to a

pain management clinic and an orthopedist. (Tr. 292). On November 26, 2007, a follow-up

letter by the Social Security Administration was sent to Totten, seeking her response in connection with her authorization to disclose information by her physician, Dr. Sellinger, to the agency. (Tr. 176).  Totten annotated that letter, indicating that Dr. Sellinger is no longer her mental health practitioner and that she "now see[s] Dr. Emmanuel."  A psychiatric progress note by "Dr. Emmanuel," dated November 28, 2007, indicated Totten complained of anxiety attacks and tiredness in the morning, but denied suicidal or homicidal ideation. (Tr. 214).  She was prescribed Efforex and Vistaril. (Tr. 214).

On January 4, 2008, consultative examiner Dr. Leslie Helprin ("Dr. Helprin") performed a psychiatric evaluation of Totten. (Tr. 224-229).  Dr. Helprin noted that Totten reported alcohol and drug abuse but no current use, and that she was "unable to work now because she cannot think clearly, reports anxiety, and does not like being around people." (Tr. 224-225).  Totten also reported that she was molested at an early age by family members. (Tr. 226).  Dr. Helprin noted Totten was cooperative during the examination and her manner of relating, social skills, and overall presentation were adequate. (Tr. 226).  Totten was "grossly obese" and her gait, posture and motor behavior were normal. (Tr. 226).  Concerning vocational skills, Dr. Helprin found that Totten "can follow and understand simple directions and instructions" and "can perform rote simple tasks and some complex tasks independently." (Tr. 227).  Moreover, Totten was able to maintain attention and concentration for job-related tasks as well as her "full regular schedule." (Tr. 227).  According to Dr. Helprin, with current treatment, psychiatric problems do not "appear to be significant enough to interfere with [Totten's] ability to function on a daily basis." (Tr. 227).  Totten was diagnosed with "Bipolar II disorder.  Polysubstance abuse in early remission" and asthma, hypertension, leg, knee and ankle pain secondary to injuries. (Tr. 228).  Dr. Halperin recommended that Totten continue with psychological, psychiatric, drug and

alcohol treatments and that she undergo medical and orthopedic evaluation to determine if problems in these areas precluded her from working. (Tr. 228). Dr. Helprin noted that Totten would benefit from vocational training as necessary for a supported job in a small work setting with consideration of any medical limitations to be determined. (Tr. 228). Dr. Helprin also noted that the prognosis was good, given the treatment prescribed. (Tr. 228).

On January 18, 2008, Totten had her first follow-up visit with Dr. Peralo, after her March 2007 visit, and the following was noted: "[r]ight knee internal derangement, rule out meniscal tear," "[r]ight ankle tendonitis/sprain, rule out occult fracture" and "[l]eft ankle tendonitis/sprain, rule out fracture." (Tr. 284-285). Dr. Peralo referred Totten for an MRI of the right knee and left ankle. (Tr. 284-285).

Dr. Marc Appel ("Dr. Appel"), a consultative physician, examined Totten on February 4, 2008, at the request of the New York State Department of Temporary and Disability Assistance Division of Disability Determinations ("the state agency"). (Tr. 247-250). Dr. Appel reported that Totten was not involved in any physical therapy and was seeing no other treating physicians and that she complained of lower back pain, pain in both ankles, pain in the front aspect of her right leg and headaches. (Tr. 248). Totten reported that the constant pain in the mid lumbar area was present since the epidural injection she received during childbirth in 2006. (Tr. 248). The pain in both her ankles was reported to occur if she stood more than ten to twenty minutes and she used a cane. (Tr. 248). The examination showed that Totten was "5'7" and weighs 280 pounds." (Tr. 248). She was able to rise from a seated position and dress without significant problem. (Tr. 248). Her motor function was "5/5," she had a normal gait, no deformities, no ecchymosis, and minimal tenderness to the medial and lateral aspects of both ankles. (Tr. 249). She had minimal tenderness to the leg area and a full range of motion to the knee and the ankle.

10

(Tr. 249).  Dr. Appel diagnosed Totten with chronic lower back pain and a history of bipolar

depression and noted that her prognosis is fair.  (Tr. 249).  Dr. Appel indicated that, from the

orthopedic point of view, he saw "no limitation in regards to employment.  She would have

difficulty with lifting, perhaps 20 to 30 pounds.  There is no problem regarding to walking,

bending, kneeling, carrying or sitting."  (Tr. 249-250).

On February 27, 2008, the state agency submitted an electronic request for medical

advice to "Med Consultant Bruni," in which it stated: "Claimant is a 29yo female alleging

disability due to bipolar, manic, and anxiety.  MER includes a CE, inpt recs and treating notes

thru 10/07.  Please advise, thank you."  (Tr. 251).  On the same date, state analyst "Notarino A."

completed a physical residual functional capacity assessment for Totten, in which it was noted

that the primary diagnosis was "s/p right LE contusions."  (Tr. 253).  According to that

assessment, Totten was found to be capable of lifting or carrying fifty pounds occasionally,

lifting or carrying twenty-five pounds frequently, standing or walking for about six hours in an

eight-hour workday, sitting for about six hours in an eight-hour workday and pushing or pulling

without limitations other than those in connection with lifting and carrying.  (Tr. 254).  Totten

was found to have no postural, manipulative, visual, communication or environmental

limitations.  (Tr. 255-256).

On February 27, 2008, medical consultant "Bruni T." completed a mental residual

functional capacity assessment for Totten, which included a psychiatric review technique form.

(Tr. 259-276).  In that assessment, Totten was found to be moderately limited in her abilities to:

(a) understand and remember detailed instructions; (b) carry out detailed instructions; (c)

maintain attention and concentration for extended periods; (d) complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a

11

consistent pace, without an unreasonable number and length of rest periods; and (e) maintain
socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.
(Tr.259-260).  The assessment concluded that, "despite a severe psychiatric impairment, [Totten]
is able to understand and remember simple instructions, sustain attention and concentration for
simple tasks, respond and relate adequately to others, and adapt to simple changes." (Tr. 261).
Totten's psychiatric review technique form reflects she was determined to have an affective
disorder identified as mental disorder, under Section 12.04 of Appendix 1 to Subpart P of Part
404 Listing of Impairments, "Bipolar II disorder" and a substance addiction disorder identified
as mental disorder, under Section 12.09 of Appendix 1 to Subpart P of Part 404 Listing of
Impairments, "Polysubstance abuse, in early remission." (Tr. 266, 271).  With respect to her
degree of functional limitations, Totten was found to have a mild limitation in relation to
restriction of daily activities and mild difficulties maintaining social functioning. (Tr. 273).  She
was also found to have moderate difficulties in maintaining concentration, persistence and pace.
(Tr. 273).  She was found to have one or two repeated episodes of deterioration of extended
duration. (Tr. 273).

On June 12, 2008, Totten was seen by Rollin, when she complained about muscle pain
caused by her bending down to pick up her daughter. (Tr. 290).  He assessed pleurisy[2] and
prescribed Mobic and Skelaxin. (Tr. 290).  On June 13, 2008, Totten had a follow-up visit with
Dr. Peralo, who noted that she was being treated for right knee internal derangement and she was
complaining of pain and tenderness in the right knee area. (Tr. 287).  Dr. Peralo recommended

---

[2] An inflamation of the two thin, transparent membranes, called the pleura or pleural
membranes that cover the lungs and line the chest wall."  American Medical Association
Complete Medical Encyclopedia 993 (Jerrold B. Leikin & Martin S. Lipsky eds. 2003).

an MRI of both Totten's left ankle and the right knee in order to rule out meniscular tear and occult fracture of the fibula or distal tibia.  (Tr. 287).  On June 27, 2008, Totten underwent an MRI of her left ankle and an "8mm accessory ossicle versus old ununited avulsion fracture next to lateral malleolus [was] noted.  Highly attenuated ATFL consistent with type II partial-thickness tear.  Mild tenosynovitis[3] of flexor halluces longus.  Sinus tarsi syndrome.  Moderate osteoarthritis in second and tarsometatarsal joint."  (Tr. 286).  On December 22, 2008, Totten was seen by Rollin, when she complained of "pain" and "pain in legs and left ankle."  (Tr. 289).  He assessed her with headache and prescribed Sklaxin, Mobic and Ultram.  (Tr. 289).

On February 17, 2009, Totten presented at the Pain Control Center ("PCC"), complaining of lumbosacral pain, which she claimed started in June 2006, when she had an epidural during childbirth and since then she suffered from chronic pain in the lumbocrural region.  (Tr. 316).  Dr. Venu Madhipatla ("Dr. Madhipatla") noted that Totten was "morbidly obese" and "emotionally liable secondary to her chronic low back pain," rated as "6/10 on VAS, sharp and arching in character."  (Tr. 316).  Totten was diagnosed with disorders of the sacrum,[4]

---

[3] "An inflamation of the sheath of tissue and membrane that surrounds a tendon and aids in moving joints."  American Medical Association Complete Medical Encyclopedia, supra note 2, at 1197.

[4] "A triangular bone in the lower SPINE." American Medical Association Complete Medical Encyclopedia, supra note 2, at 1086.

13

lumbosacral spondylosis[5] without myelopathy[6] and unspecified myalgia[7] and myositis.[8]  (Tr. 317).  Dr. Madhipatla noted "lumbar facet arthropathy right greater than left side.  Sacroiliac joint arthropathy right greater than the left side.  Lumbar myofascial pain."  (Tr. 317).  An MRI of the lumbosacral spine was recommended, followed by facet joint injections and radiofrequency in the future.  (Tr. 317).  Totten received prescriptions for the muscle relaxants, Robaxin and Darvocet.  (Tr. 317).

On April 9, 2009, Totten returned to PCC for a follow-up visit and medication refills, where she was seen by Dr. Mahmoud Abu-Ghanam.  (Tr. 318).  Totten was alert, with no acute distress and the examination revealed "exquisite tenderness at the L4-L5 level in addition to the paravertebral muscle tenderness and facet tenderness."  (Tr. 318).  The examination of the right knee revealed a "range of motion in all directions and moderate tenderness to pressure."  (Tr. 318).  Totten had a right knee injection of DepoMedrol with Marcaine and was given a refill for Celebrex, Baclofen and Darvocer.  (Tr. 318).  On May 15, 2009, she underwent an epidural injection and lumbar facet joint block, without any complications.  (Tr. 321-322).

On June 2, 2009, a Medical Source Statement of Ability to Do Work-Related Activities (Mental) was completed by Dr. Joseph Emmanuel ("Dr. Emmanuel").  (Tr. 324-326).  Dr.

---

[5] "A term referring to various degenerative diseases of the spine."  American Medical Association Complete Medical Encyclopedia, supra note 2, at 1154.

[6] "Symptoms of spinal cord impairment from spinal cord disease."  American Medical Association Complete Medical Encyclopedia, supra note 2, at 878.

[7] "Muscle pain, often due to an overuse stress injury, that is generally caused by using the muscles in a new or unusual activity for a prolonged period of time." American Medical Association Complete Medical Encyclopedia, supra note 2, at 875.

[8] "Inflamation of muscle."  American Medical Association Complete Medical Encyclopedia, supra note 2, at 881.

Emmanuel noted that Totten had a moderate ability to understand and remember short, simple instructions and make judgments on simple work-related decisions, and that she had a slight ability to carry out short, simple instructions, understand and remember detailed instructions and carry out detailed instructions.  (Tr. 324).  He also noted that her ability to respond to supervision and co-workers in a work setting is not affected by her impairments.  (Tr. 325).  Dr. Emmanuel stated that the effect of Totten's impairments on her capability to carry out simple instructions was "poor attention concentration cannot carry out simple instructions or complete given tasks."  (Tr. 325).  Although he noted that Totten's impairments do not include alcohol and substance abuse, he stated that Totten has a long history of mental problems, she was unable to keep a job and "now since last few years cannot work because of depression, anxiety, [and] panic attacks."  (Tr. 325).

***The ALJ's Decision***

The issue before the ALJ was whether Totten was disabled on or before March 31, 2009, the date through which Totten remained insured.  (Tr. 9).  The ALJ determined that Totten: (1) meets the insured status requirements of SSA through March 31, 2009; (2) had not engaged in substantial gainful activity since June 1, 2006, the alleged onset date of her disability; (3) has the severe impairments of obesity, bipolar disorder, substance abuse and a back impairment; (4) does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;  (5) has residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b) at the basic unskilled work level; (6) has past relevant work experience as a waitress, hotel housekeeper and  cashier; (7) was born on May 12, 1978, and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date; (8) has at least a high

15

school education and is able to communicate in English; (9) does not have skills acquired in past relevant work that would raise an issue of transferability of job skills; (10) can perform jobs that exist in significant numbers in the national economy, considering her age, education, work experience and residual functional capacity; and (11) has not been under a disability as defined by SSA from June 1, 2006, through the date of the ALJ's decision.  (Tr. 11-18).  More specifically, the ALJ determined that Totten's mental impairments singly or in combination do not result in at least two marked restrictions and difficulties because she had mild restrictions in daily activities and social functioning, moderate difficulties in concentration, persistence or pace and she experienced no decompensation episodes of extended duration during the period at issue. (Tr. 12).  Moreover, Totten is able to live independently.  (Tr. 12).  Therefore, the ALJ determined that Totten's "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04 and 12.09."  (Tr. 11).

With respect to Totten's residual functional capacity to perform light work at the basic unskilled work level, the ALJ found that Totten's testimony "was that her inability to work results not as much from *her* medical impairments but by the medical impairments of her children."  (Tr. 13).  The ALJ noted that Totten did not seek medical treatment for her back injuries received during childbirth and in the January 2007 car accident, until February 2009. (Tr. 13).  After she was treated for her right knee and ankle injuries sustained during the January 2007 car accident, no medical observations were done for the period of fifteen months following her initial visit to Dr. Peralo in March 2007.  (Tr. 13).  The ALJ stated that Totten had "a history of back and lower extremity pain that is most likely made more severe by obese condition," but that had not "prevented her from engaging in significant activities of daily living, which include child care for her 18-month-old daughter (new born on the alleged onset date) and her two sons,

16

age 4 and 11." (Tr. 14). Additionally, the ALJ noted, Totten "acknowledged that she is able to engage in all self-care activities, to cook for herself and her three children, to pay bills, count change, handle a savings account and to use a checkbook/money orders," as well as regularly attend church on Sundays, medical health appointments and drug and alcohol parenting classes, sometimes one to three times per week. (Tr. 14-15). Totten also "acknowledged an ability to shop for herself and her family and to walk approximately one half mile." (Tr. 15).

The ALJ reviewed Silverman's July 23, 2007 report as well as her updated report from October 1, 2007, in which she noted medical improvement and that Totten "made sufficient progress to justify the return of her two sons to her custody." (Tr. 15). The ALJ discussed Dr. Helprin's psychiatric consultative examination report, noting Dr. Helprin's conclusion that Totten "can follow and understand simple directions, perform rote simple tasks and some complex tasks independently, as well as maintain attention and concentration for job-related tasks." (Tr. 15). Moreover, Dr. Helprin found that Totten "is able to maintain a full regular schedule, make appropriate decisions, generally relate adequately with others and deal appropriately with stress of a job in a small workplace with support." (Tr. 15).

Next, the ALJ noted that Dr. Emmanuel was a psychiatrist with Sullivan County Community Services and that his report, dated June 2009, did not reflect Totten's mental condition over the prior three years. (Tr. 16). He stated that Dr. Emmanuel's opinion reported "'moderate' limitations in [Totten's] ability to understand and remember short, simple instructions or make simple work-related decisions," and that Totten "cannot carry out simple instructions or complete a series of tasks." (Tr. 16). The ALJ observed that "[t]here clearly was a difference of opinion between Dr. Helprin's evaluation of January 2008 and Dr. Emmanuel's of June 2009." (Tr. 16). The ALJ stated:

17

> In order to help resolve this difference of opinion, the administrative law judge requested that the claimant's attorney provide a copy of the Order issued by the Family Court in connection with the claimant's petition for custody of her children. Social Worker Silverman had provided an updated bio-psycho-social evaluation to the Family Court which concluded that the claimant had made sufficient progress in her mental health issues to justify the return of her two sons to her custody. Relying of [sic] Ms. Silverman's report, the Family Court Judge apparently concluded that the claimant was mentally well enough to care for her children and for herself. The claimant's attorney, however, did not provide the Family Court rationale or findings even though the record was held open for more than three months subsequent to the hearing date. The undersigned has made a negative inference because the claimant (who bears the burden of proving her disability) is the only person who is authorized to deliver this crucial document. Dr. Emmanuel's opinion would be inconsistent with the Family Court's ultimate actions.

(Tr. 16).

The ALJ stated that, although Dr. Emmanuel noted Totten's problems with concentration and focus in June 2009, his report did "not reflect Totten's mental condition over the ***prior three years*** - which is the period of time at issue" and "was highly conclusory in that it did not specify the basis for the conclusions reached." (Tr. 17). The ALJ found that, after Totten's psychiatric hospitalization in 2007, a "[s]ignificant medical improvement was noted by her treating sources by October 2007" and Dr. Helprin's consultative psychiatric examination of January 4, 2008, concluded that Totten's psychiatric problems were not significant enough to interfere with her daily activities, which was consistent with Totten's testimony at the hearing. (Tr. 17). Totten's physical and mental impairments were found to be consistent with her residual functional capacity to perform basic, unskilled, light exertion level work, doing tasks with which she was familiar. (Tr. 15-17). The ALJ also determined that Totten could perform other jobs existing in the national economy. He concluded that Totten was not disabled from June 1, 2006, through the date of his decision. (Tr. 19).

18

*Parties' Contentions*

In her complaint, Totten alleged various errors by the ALJ, including that he: (a) failed to combine her impairments; (b) ignored pertinent evidence; © failed to give controlling weight to the opinion of the treating physician, Dr. Emmanuel, or considered whether to give significant weight to that opinion; (d) failed to clarify evidence from the treating physician; (e) failed to provide "good reasons why he did not give the opinions of Plaintiff's treating source controlling or significant weight"; (f) "substituted his own judgment as to the nature and extent of [Totten]'s medical problems and her impairments provided by [her] treating source"; (g) failed to develop evidence; (h) failed to explain why her impairments did not meet the listing of impairments; (I) misapplied the regulations in determining credibility and that Totten had past relevant work as a waitress, hotel housekeeper and cashier; (j) misapplied medical vocational guidelines; and (k) failed to employ a vocational expert.  According to Totten, the ALJ's decision is not supported by substantial evidence and is contrary to law.

The Commissioner contends his decision, that Totten was not disabled, is supported by substantial evidence.  According to the Commissioner, the ALJ found correctly that Totten's impairments do not meet the listing of impairments in Appendix 1 to Subpart P of Part 404 of the pertinent regulations.  The medical evidence is consistent with the ALJ's finding that Totten could perform light work and the ALJ relied on the opinion of Dr. Appel properly.  The ALJ's assessment included a non-exertional limitation for unskilled work, due to Totten's mental impairment, and he accorded appropriate weight to the opinion of Totten's treating physician, Dr. Emmanuel, given that the opinion was conclusory, did not reflect Totten's mental condition over the prior three years and was inconsistent internally.  Moreover, substantial evidence supports the ALJ's conclusion that Totten's subjective complaints about pain were not consistent

with her allegations of disability. The ALJ also found, properly, that Totten was able to perform her past relevant work as well as other work existing in the national economy.

In her cross-motion, Totten contends that the ALJ: (1) "failed to combine the effects of her exertional and nonexertional impairments as well the effect of pain, and her obesity on other impairments; he failed to provide a function-by-function analysis of her impairments"; (2) "erred in failing to apply the Commissioner's Regulations in evaluating the opinion of Dr. Emmanuel about [Totten]'s mental impairments, . . . failed to consider whether Dr. Emmanuel's opinions were entitled to significant weight, and. . . failed to clarify an apparent contradiction in Dr. Emmanuel's reports"; (3) "failed to explain why Ms. Totten's impairment did not meet or equal the Listings of Impairments"; (4) "misapplied the Commissioner's Regulations and Rulings in evaluating Ms. Totten's credibility"; (5) "misapplied the Commissioner's Regulations and Rulings in evaluating Ms. Totten's residual functional capacity"; and (6) "should have used a vocational expert in meeting the Commissioner's burden at the fifth step of the sequential evaluation."

In his reply, the Commissioner contends the ALJ considered properly Totten's obesity in his evaluation of evidence, because he found it to be a severe impairment at step two and he considered it in combination with her musculosceletal impairments, as well as accounted for it in his assessment of Totten's residual functional capacity. The ALJ also considered properly the opinions of treating and examining physicians as well as the opinions of social workers and he evaluated properly the medical evidence pursuant to the psychiatric review technique and explained sufficiently his findings.

**DISCUSSION**

*Legal Standard*

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."   Fed. R. Civ. P. 12©.  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. §405(g).

> A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citations omitted).  "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations."  Kohler, 546 F.3d at 265 (internal citations omitted).   "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled, or to answer in the first instance the inquiries posed by the five-step analysis set out in the SSA regulations."  Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (internal citation omitted).

To qualify for disability benefits, an individual must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see 42 U.S. C. § 1382c(a)(3)(A).  The SSA regulations establish a five-step process for determining a disability claim.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> If at any step a finding of disability or nondisability can be made, the [Social Security Administration] will not review the claim further.  At the first step, the

> agency will find nondisability unless the claimant shows that he is not working at a
> "substantial gainful activity."  At step two, the [Social Security Administration] will
> find nondisability unless the claimant shows that he has a "severe impairment,"
> defined as "any impairment or combination of impairments which significantly
> limits [the claimant's] physical or mental ability to do basic work activities."  At step
> three, the agency determines whether the impairment which enabled the claimant to
> survive step two is on the list of impairments presumed severe enough to render one
> disabled; if so, the claimant qualifies.  If the claimant's impairment is not on the list,
> the inquiry proceeds to step four, at which the [Social Security Administration]
> assesses whether the claimant can do his previous work; unless he shows that he
> cannot, he is determined not to be disabled.  If the claimant survives the fourth stage,
> the fifth, and final, step requires the [Social Security Administration] to consider so-
> called "vocational factors" (the claimant's age, education, and past work experience),
> and to determine whether the claimant is capable of performing other jobs existing
> in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003) ( internal citations

omitted).  "[T]he ALJ generally has an affirmative obligation to develop the administrative

record."  Melville, 198 F.3d at 51.  Additionally, in determining disability, the ALJ must adhere

to the regulations governing the evaluation of the severity of mental impairments, which "require

application of a 'special technique' at the second and third steps of the five-step framework, and

at each level of administrative review."  Kohler, 546 F.3d at 265 (citations omitted); see 20

C.F.R. §§ 404.1520a(a), 416.920a(a).  If the claimant is found to have a mental impairment, the

ALJ must "rate the degree of functional limitation resulting from the impairment(s)" in four

broad functional areas in order to determine the severity of mental impairment(s): (1) activities

of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of

decompensation.  See 20 C.F.R. §§ 404.1520a(a)-(c), 416.920a(a)-(c).  If mental impairment(s)

is severe, the ALJ then determines if it meets or is equivalent in severity to a listed mental

disorder.  See 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2).  This is done "by comparing the

medical findings about [the claimant's] impairment(s) and the rating of the degree of functional

limitation to the criteria of the appropriate listed mental disorder."  20 C.F.R. §§

404.1520a(d)(2), 416.920a(d)(2).  If the ALJ finds that the claimant has "a severe mental

impairment(s) that neither meets nor is equivalent in severity to any listing, [the ALJ] will then

assess [the claimant's] residual functional capacity."  20 C.F.R. §§ 404.1520a(d)(3),

416.920a(d)(3).  The application of this process must be documented.  See 20 C.F.R. §§

404.1520a(e), 416.920a(e).

> [T]he written decision must incorporate the pertinent findings and conclusions based
> on the technique.  The decision must show the significant history, including
> examination and laboratory findings, and the functional limitations that were
> considered in reaching a conclusion about the severity of the mental impairment(s).
> The decision must include a specific finding as to the degree of limitation in each of
> the functional areas described in paragraph (c) of this section.

> 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

In making his decision, the ALJ must consider: "(1) the objective medical facts; (2)

diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability

testified to by the claimant or others; and (4) the claimant's educational background, age, and

work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v.

Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).  "Although the claimant bears the general burden

of proving that he is disabled under the statute, 'if the claimant shows that his impairment

renders him unable to perform his past work, the burden then shifts to the [Commissioner] to

show there is other gainful work in the national economy which the claimant could perform.'"

Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002) (quoting Carroll v. Sec'y of Health &

Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

***Application of Legal Standard***

## First Step

The ALJ's determination, at the first step, that Totten has not engaged in substantial

gainful activity since June 1, 2006, the alleged onset date, is not challenged.

## Second Step

The ALJ's determination, at the second step, that Totten "has the following severe impairments: obesity, bipolar disorder, substance abuse and a back impairment" is not challenged.

## Third Step

*(a ) Failure to Combine the Effects of all of Totten's Impairments*[9]

Under the subheading "Her obesity and its effect on her other impairments" of Totten's memorandum of law, she contends that, although the ALJ "recognized that [she] had a severe impairment likely made more severe by her obese condition, . . . he didn't consider the opinion of treating and examining sources about the extent of her exertional impairments in standing and walking.  Instead, he referred to statements she made in her disability application.  They were not as material as the evidence regarding her medical treatment."  The Commissioner contends "the ALJ clearly considered that plaintiff's physicians had not opined that she had limitations in standing and walking" and "the ALJ properly considered plaintiff's obesity in evaluating

---

[9] Under the subheading "Impairments in her lower back, knees and ankles," Totten contends that "[s]he suffered from medical conditions likely to cause pain."  However, apart from reciting certain medical history, she makes no argument under this subheading.  Moreover, under the subheading "Psychiatric Impairment," Totten states:

> The record consists of two reports from sources who either treated or examined Ms. Totten.  It also consists of an evaluation by T. Bruni, not otherwise identified, who reviewed the report of Dr. Helprin, the consultative examiner.  The ALJ rejected all of their opinions.  In the process, he misinterpreted or misunderstood their reports and misapplied the Commissioner's Regulations in considering the report by Dr. Emmanuel, the treating Psychiatrist, and the reports of the licensed social workers who treated her.  Thus, he had no medical support for his finding.

Totten does not identify the "two reports" referenced above or what "finding" she challenges in the subheading "Psychiatric Impairment."

24

evidence."

> Because there is no listing for obesity, [the ALJ] will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. [The ALJ] will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. . . . [The ALJ] may also find that obesity, by itself, is medically equivalent to a listed impairment. . . . [The ALJ] will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. . . . Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. [The ALJ] will evaluate each case based on the information in the case record.

Social Security Ruling ("SSR") 02-1p (S.S.A. Sep. 12, 2002).

Totten does not identify the "opinions of treating and examining sources about the extent of her exertional impairments in standing and walking" that the ALJ allegedly failed to consider, or who those "treating and examining sources" are, or what particular findings in those opinions the ALJ failed to consider.  While Totten argues that "the evidence regrading her medical treatment" was more material than the statements she made in her disability application, she fails to identify any specific medical evidence claimed to be more material than her statements. Substantial evidence exists in the record to support the ALJ's findings concerning the extent of Totten's exertional limitations, which affect her ability to meet the standing and walking strength demands of a job.  See 20 C.F.R. §§ 404.1569a, 416.969a.  For example, in the diagnosis section of his February 4, 2008 examination report, Dr. Appel found that "[t]here is no problem regarding to [sic] walking, bending, kneeling, carrying or sitting," (Tr. 249) and this finding is consistent with other evidence in the record, including Totten's statements concerning her exertional limitations.  Thus, absent identification of any medical evidence claimed not to be considered by the ALJ and in light of the entire evidence in the record, the plaintiff has not met

25

her burden of showing that the ALJ erred in failing to consider the extent of Totten's exertional limitations in standing and walking.

Moreover, based on the record of the case, the ALJ considered the effect of Totten's obesity on her other impairments properly, stating: "No specific limitations in sitting, standing and walking have been assessed by physicians, but it would be expected that her obese condition would limit her ability to stand/walk to six hours per eight hour work day, but would not limited [sic] her ability to sit eight hours in an eight hour work day."  (Tr. 15).  "The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say."  Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983).  Accordingly, the argument that the ALJ failed to combine the effects of all Totten's impairments has no merit.

*(b) Failure to Accord Proper Weight to Dr. Emmanuel's and Silverman's Opinions[10]*

Totten contends the ALJ failed to give controlling weight to the narrative portion of Dr. Emmanuel's opinion, "which was handwritten[,] . . . that Totten suffered from poor concentration and was not able to carry out simple instructions or given tasks."  That opinion, Totten maintains, is "well supported" since Dr. Helprin opined that Totten "would only be able to deal with the stress of working in a small workplace for a supported job with consideration for any medical limitations to be determined."  According to Totten, "she could not perform in competitive employment" and "could not sustain function in an ordinary workplace without support and then only in a small workplace."  Furthermore, Silverman noted that Totten's GAF was 51, which indicates serious symptoms or impairment in social, occupational or school

_____

[10]  As noted above, Donna Schick is Silverman's supervisor who signed Silverman's reports, dated July 23, and October 1, 2007.  Although Totten contends the ALJ did not accord proper weight to Schick's opinion, no separate opinion by Schick exists in the record.

functioning, such as "unable to keep a job."  Totten contends that the ALJ failed to follow the

technique established by the regulations and "[w]ithout the explanation required by the

[technique], the reviewing court is unable to 'identify findings regarding the degree of [the

claimant's] limitations in each of the four functional areas nor discern whether the ALJ properly

considered all evidence relevant to those areas.' . . .  Having rejected all the reports of medical

sources, treating or otherwise, the ALJ was left with nobody's opinion but his own.  His

conclusion must be based on evidence not his own hunches."  Moreover, if the ALJ "had doubts

about Dr. Emmanuel's opinion regarding 'moderate' impairments in the portion of his report ion

[sic] which he indicated that opinion, he should have clarified it"; thus, he erred in failing "to

develop evidence from Dr. Emmanuel."

    The Commissioner contends that "the ALJ considered the physician opinion evidence in

light of the factors set forth in the regulations," namely: (a) "he considered the length, nature and

extent of the treatment relationship plaintiff had with Dr. Emmanuel" when he stated that Dr.

Emmanuel's report did not reflect Totten's mental condition over the three years prior to the

report; (b) "[h]e considered whether the evidence was consistent" when he stated that Dr.

Emmanuel's opinion was inconsistent with Dr. Helprin's, and (c) "he considered a variety of

'other factors.'"  Moreover, the Commissioner contends, "the ALJ is not required to evaluate the

opinions of social workers pursuant to the same factors as treating physicians when their

opinions ate not found controlling."

    Generally, if the ALJ finds "that a treating source's opinion on the issue(s) of the nature

and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. §§

404.1527(d)(2), 416.927(d)(2).  When the ALJ does not give the treating source's opinion controlling weight, he applies the factors listed in the regulations in determining the weight to give the opinion.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  These factors include: (a) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the support for and explanation of the opinion; and (4) any other factors which "support or contradict the opinion."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

"After considering the above factors, the ALJ must comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.  Failure to provide . . . good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." Burgess v. Astrue, 537 F.3d 117, 129-30 (2d Cir. 2008) (citations and internal quotation marks omitted).

> When the evidence [received] from [the claimant's] treating physician or psychologist or other medical source is inadequate for [the ALJ] to determine whether [the claimant is] disabled, [the ALJ] will need additional information to reach a determination or a decision. . . . [The ALJ] will seek additional evidence or clarification from [the claimant's] medical source when the report from [the claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. [The ALJ] may do this by requesting copies of [the claimant's] medical source's records, a new report, or a more detailed report from [the claimant's] medical source, including [the claimant's] treating source, or by telephoning [the claimant's] medical source.
>
> 20 C.F.R. §§ 404.1512(e) and 416.912(e).

Additionally, the regulations contemplate that, if the information sought is not readily available from the records of the claimant's medical treatment source, the ALJ "will ask [the claimant] to attend one or more consultative examinations at our expense." 20 C.F.R. §§ 404.1512(f) and

416.912(f).  "[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."  <u>Burgess</u>, 537 F.3d at 129 (quoting <u>Rosa v. Callahan</u>, 168 F.3d 72, 79 (2d Cir. 1999)).

     Here, the ALJ did not give controlling weight to Dr. Emmanuel's opinion.  Other than stating that Dr. Emmanuel's report, dated June 2, 2009, was different from Dr. Helprin's opinion and that it "does not reflect the claimant's mental condition over the ***prior three years*** - which is the period at issue," the ALJ's opinion does not indicate that he considered the factors required to be considered by the regulations in determining what weight to give to the treating physician's opinion when it is contradicted by other medical evidence.  Although Dr. Emmanuel's June 2, 2009 report does not indicate Totten's mental condition over the three years prior to the report, evidence exists in the record, authored by Dr. Emmanuel, about Totten's mental condition in 2007.  No indication exists in the ALJ's opinion that he considered evidence showing that Dr. Emmanuel treated Totten after her hospitalization for mental problems in July 2007 and that Dr. Emmanuel issued psychiatric progress notes for Totten on September 26, October 30 and November 28, 2007.  (Tr. 214, 217-218).  Dr. Emmanuel's notes of September 2007 indicate, <u>inter alia</u>, "H/O major depressive D/O, and personality D/O, H/O Burning of herself."  (Tr. 217).  On October 30, 2007, Dr. Emmanuel's notes indicate "H/O Bipolar D/O, Borderline personality D/O 'Burn herself when got depressed,'" and his notes of November 28, 2007, indicate "H/O Bipolar D/O Borderline personality D/O ? PTSD."  (Tr. 214).  (Tr. 218).  Thus, the evidence in the record about Dr. Emmanuel's treatment of Totten in 2007 undermines the ALJ's reason for rejecting Dr. Emmanuel's June 2009 report on the basis that information of Totten's mental condition over the period of three years, prior to the June 2009 report, was lacking.

     The ALJ also did not indicate in any way that he considered the length of Totten's

treatment relationship with Dr. Emmanuel, the frequency of examination and the nature and extent of the treatment relationship, or what that information shows.  Moreover, the ALJ did not indicate that he considered any support for and explanation of Dr. Emmanuel's opinion or any other factors which support Dr. Emmanuel's opinion.  The ALJ's decision reflects only that he considered evidence he believed contradicted Dr. Emmanuel's opinion, namely, Dr. Helprin's findings concerning Totten's ability to "follow and understand simple directions, perform rote simple tasks and some complex tasks independently as well as maintain attention and concentration for job-related tasks" and Dr. Helprin's conclusion that Totten was "able to maintain a full regular schedule, make appropriate decisions, and generally relate adequately with others and deal appropriately with stress of a job in a small workplace with support."  (Tr. 15).  The ALJ's opinion does not indicate what other evidence he considered contradicting Dr. Emmanuel's June 2009 report.  The ALJ's opinion also fails to indicate what, if any, other factors he considered in determining what weight to give to Dr. Emmanuel's opinion.  Similarly, the ALJ did not set forth comprehensively his reasons for rejecting Dr. Emmanuel's opinion, other than noting its inconsistency with "the Family Court's ultimate actions" of awarding Totten custody of her children and with Dr. Helprin's opinion.

Additionally, the ALJ failed to address the internal inconsistency in Dr. Emmanuel's June 2009 report, acknowledged by Totten's counsel in a letter to the ALJ, dated June 2, 2009, where it was noted that Dr. Emmanuel's statement "is somewhat unclear [since] the boxes Dr. Emmanuel has checked off regarding the claimant's functional abilities does [sic] not comport with his narrative."  (Tr. 199).  In his June 2, 2009 report, Dr. Emmanuel indicated, under question one "(1) Is ability to understand, remember and carry out instructions affected by the impairment?," that Totten had moderate restrictions in understanding and remembering short,

30

simple instructions and making judgments on simple-work related decisions and that she had

slight restrictions in carrying out short, simple as well as detailed instructions.  (Tr. 324).  The

restrictions on the Medical Source Statement of Ability to Do Work-Related Activities (Mental)

form consist of the following: (a) none; (b) slight; © moderate; and (d) extreme.  (Tr. 324).  It is

unclear why, under question three, "(3) Are any other capabilities affected by the impairment?,"

Dr. Emmanuel listed "Carry out simple instruction," an ability he already assessed as being

slightly restricted under question one.  (Tr. 324).  Moreover, his narrative conclusion under

question three, that Totten "cannot carry out simple instruction" is contrary to his assessment

under question one, that Totten has only slight restrictions in connection with that ability, using a

scale that includes none, slight, moderate, marked and extreme as choices for describing an

individual's restrictions for the work-related mental activities.  It is also not clear what the basis

for Dr. Emmanuel's conclusion that Totten cannot "complete given tasks" was, what those tasks

are or when, where or by whom they were given.  The record is devoid of any evidence that

Totten failed to complete any particular tasks during the time of her prior employment or since

the alleged onset of her disability.

In an attempt to resolve the inconsistency of Dr. Emmanuel's opinion with Dr. Helprin's,

the ALJ requested the Family Court's "rationale or findings," which the plaintiff failed to

provide.  However, the ALJ's request of additional evidence from the plaintiff concerning the

Family Court's rationale does not satisfy the ALJ's affirmative obligation to resolve the internal

conflict in Dr. Emmanuel's June 2, 2009 report by seeking additional or clarifying information

from Dr. Emmanuel.  See 20 C.F.R. §§ 404.1512(e), 416.912(e).

The ALJ also failed to mention in his decision the Mental Residual Functional Capacity

Assessment of Totten using the psychiatric review technique, conducted by Bruni T.  The ALJ's

31

findings with respect to certain categories of functional limitations match Bruni T.'s findings

that: (I) the restrictions of Totten's daily activities were mild; (ii) she had mild difficulties in

maintaining social functioning; and (iii) moderate difficulties in maintaining concentration,

persistence or pace.  (Tr. 12, 273).  However, Bruni T. also found, in the February 27, 2008

assessment, based on "the evidence in file," that Totten had one or two repeated episodes of

deterioration each of extended duration, which contradicts the ALJ's finding of "no episodes of

decompensation which have been of extended duration during the period at issue."  (Tr. 12, 259,

273).  The record indicates that, on August 13, 2007, in the initial psychiatric evaluation, Dr.

Salgunan recommended, inter alia, adjusting medications and preventing  decompensation.  (Tr.

213).  Although the record evidence does not demonstrate episodes of decompensation, Bruni

T.'s finding on decompensation episodes based on "the evidence in file," contradicts that of the

ALJ.  The failure of the ALJ to explain his conclusions on the four functional areas required to

be assessed using the special technique does not aid the Court in reviewing whether the ALJ

adhered to the regulations' requirements.  Since the ALJ's findings that Totten's mental

impairments do not cause one "marked" limitation in daily living, social functioning or

concentration, persistence or pace, any error concerning the ALJ's finding on repeated episodes

of decompensation is harmless because even if the ALJ found repeated episodes of

decompensation, in light of the ALJ's other findings, Totten would not satisfy Paragraph B or C

of the Appendix 1 Listing of Impairments.  However, the ALJ's failure to provide a "good

reason" for rejecting the treating physician's opinion is a ground for remand.  See Snell v. Apfel,

177 F.3d 128, 133 (2d Cir. 1999).

© *Failure to Explain the Findings that Totten Did Not Meet or Medically Equal the Listings of Impairments*

Totten contends the ALJ failed to explain why her impairments do not meet or medically equal a listed impairment and "[a]rguably, the combination of the injury to Ms. Totten's knee, ankle and together with her lower spine and mental illness equaled the Listings." The Commissioner contends that Totten's "physical impairment implicates Listing sections 1.02 and 1.04, with the threshold requirements of 'gross anatomical deformity' and 'disorders of the spine [], resulting in compromise of a nerve root', respectively. . . . Simply, the medical record does not implicate this threshold criteria."

Contrary to Totten's argument, the ALJ explained his findings concerning the effect of Totten's lower back and knee and ankle injuries on his determination of whether her impairments meet or medically equal any listing impairments. More specifically, the ALJ noted that, while Totten alleged she received injuries to her lower back during childbirth in 2006 and the January 2007 car accident, "she did not seek actual medical treatment for her back impairment **until February 2009**." (Tr. 13). Concerning Totten's injuries to her right knee and ankle in the car accident, the ALJ explained the treatment Totten had with Dr. Peralo in March 2007 and noted that "[t]here was no further **treating** medical observation until 15 months later." (Tr. 13). The ALJ provided relevant history concerning Totten's medical treatment in connection with her physical impairments. (Tr. 13-15). Therefore, Totten's argument that the ALJ failed to explain his finding that her impairments do not meet or medically equal the listing impairments is without merit.

*(d) The ALJ Misapplied Regulations Regarding Credibility*

Totten contends the ALJ misapplied the regulations concerning subjective evidence of

pain, which "when accompanied by objective medical evidence, as exists here, is entitled to great weight." Moreover, "the ALJ erred in drawing an adverse inference from the fact that he asked Ms. Totten's attorney to obtain a copy of the court order regarding restoring the custody of her children to her," because "[t]he obligation was his" and "he could have contacted the Court himself to obtain it." The Commissioner contends the ALJ discredited Totten's allegations of pain properly because they were not consistent with her claim of disability.

"[T]he credibility of an individual's statements about pain and other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p (S.S.A. July 2, 1996). The ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).

Here, the ALJ found Totten partially credible and he exercised his discretion properly in discrediting parts of her testimony because her "statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with the overall medical evidence and the . . . residual functional capacity assessment." (Tr. 13). The ALJ concluded, properly, that "[t]he essence of [Totten]'s testimony, then, was that her inability to work results not as much from *her* medical impairments but by the medical impairments of her children." (Tr. 13). The ALJ's findings were not clearly erroneous and he did not misapply the regulations in connection with his assessment of Totten's credibility.

### Fourth Step

Totten also argues that the ALJ's findings on her residual functional capacity and her

ability to do her past work were erroneous because he failed to provide a function by function

analysis.   The Commissioner contends that the ALJ "properly evaluated whether the impairment

imposed significant limitations on [Totten's] ability to perform light work" and her "residual

functional capacity included a limitation resulting from [her] mental impairment - the ability to

perform 'basic unskilled' work only - but such a limitation does not significantly erode her

occupational base for light work."

A claimant's residual functional capacity is the most that person can do despite her

limitations.  See 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

> The [residual functional capacity] assessment is a function-by-function assessment
> based upon all of the relevant evidence of an individual's ability to do work-related
> activities. . . . The [residual functional capacity] must address both the remaining
> exertional and nonexertional capacities of the individual.   Exertional capacity
> addresses an individual's limitations and restrictions of physical strength and defines
> the individual's remaining abilities to perform each of seven strength demands:
> Sitting, standing, walking, lifting, carrying, pushing, and pulling.   Each function
> must be considered separately (e.g., "the individual can walk for 5 out of 8 hours and
> stand for 6 out of 8 hours"), even if the final [residual functional capacity]
> assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull"). . . . It
> is especially important that adjudicators consider the capacities separately when
> deciding whether an individual can do past relevant work. . . . Nonexertional
> capacity considers all work-related limitations and restrictions that do not depend on
> an individual's physical strength, i.e., all physical limitations and restrictions that are
> not reflected in the seven strength demands, and mental limitations and restrictions.
> It assesses an individual's abilities to perform physical activities such as postural
> (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing),
> communicative (hearing, speaking), and mental (e.g., understanding and
> remembering instructions and responding appropriately to supervision).   In addition
> to these activities, it also considers the ability to tolerate various environmental
> factors (e.g., tolerance of temperature extremes).   As with exertional capacity,
> nonexertional capacity must be expressed in terms of work-related functions.

SSR 96-8p (S.S.A. July 2, 1996).

The residual functional capacity assessment "is used at step 4 of the sequential evaluation

process to determine whether an individual is able to do past relevant work, and at step 5 to

determine whether an individual is able to do other work, considering his or her age, education, and work experience." Id. "Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." SSR 82-62 (1982). Determining whether the claimant has the ability to perform past relevant work requires appraising: (1) the claimant's statements about which past work requirements can no longer be met and the reasons for the inability to meet them; (2) medical evidence establishing how the impairment limits the claimant's ability to meet the physical and mental demands of the work; and (3) in some cases, supplemental information from other sources on the requirements of the work as generally performed in the economy. See id.

Here, with respect to her physical limitations, the ALJ determined that Totten's "obese condition would limit her ability to stand/walk to six hours per eight hour work day, but would not limit her ability to sit eight hours in an eight hour work day" and he estimated that "she would be limited to lifting/carrying objects weighing 20 pounds or less due to her musculoskeletal [sic] pains. This is consistent with an ability to perform light exertion level work." (Tr. 15). With respect to her mental limitations, the ALJ determined that Totten would have a moderate limitation in her ability to concentrate and, while she "would not be capable of performing highly complex work tasks; however, she has been fully capable of performing basic, unskilled work tasks and work tasks with which she is familiar." (Tr. 17). The ALJ also found that Totten has past work experience "as a Waitress, a Hotel Housekeeper and a Cashier," those "jobs are performed at the light exertional level," and "the demands and duties of such work are consistent with [her] residual functional capacity."

In assessing Totten's residual functional capacity, the ALJ did not consider each function

36

separately, as required by the regulations.  After stating that "no specific limitations in sitting,

standing and walking have been assessed by physicians," he combined some of the functions

related to her exertional capacity, namely, "stand[ing]/walk[ing]" and "lifting/carrying," in his

final assessment and concluded, without separate discussion of each work-related activity in

connection with her nonexertional capacity, that Totten can perform "basic, unskilled work tasks

and work tasks with which she was familiar." (Tr. 15, 17).  The ALJ failed to consider certain

functions entirely, such as pushing and pulling or postural, manipulative, communicative

functions or responding to supervision.  In her application, Totten provided some information

about the tasks she performed when she worked as a cashier, waitress and housekeeper.

However, at the hearing no inquiry was made of Totten about her past work experience.  The

Dictionary of Occupational Titles ("DOT") explains that one of the past jobs Totten performed,

namely cleaner in a hotel, includes not only cleaning rooms and halls but a variety of other tasks,

such as moving furniture, hanging drapes and rolling carpets.  Given that the duties performed

by a cleaner in a hotel include activities requiring an ability to push or pull or both, the ALJ's

failure to discuss those functions was an error.  See DOT 323.687-014.  Similarly, the ALJ failed

to address separately Totten's nonexertional functions, such as, for example, handling things, a

function required for the jobs of a waitress and a cleaner,  see DOT 311.477-030 and 323.687-

014, or communicating with customers, a function required for the job of a cashier, see DOT

211.462-014.  Accordingly, the ALJ erred when he failed to perform a function-by-function

assessment based on all relevant evidence of Totten's ability to do work-related activities and to

address certain relevant functions entirely.

**Fifth Step**

Totten argues that the Commissioner did not meet the burden of proof at the fifth step

because the ALJ erroneously relied on the Medical Vocational Guidelines instead of using a vocational expert.  The Commissioner argues that the non-exertional limitation "was incorporated into [the Medical Vocational Guidelines]" and "the ALJ properly relied on [those guidelines] to make his finding."

Since the ALJ determined that Totten was not disabled at the fourth step, no need existed to proceed to the fifth step of the sequential analysis.  See Barnhart, 540 U.S. at 24, 124 S. Ct. at 379 ("If at any step a finding of disability or nondisability can be made, the [ALJ] will not review the claim further.").  In light of the above errors by the ALJ, the fifth step need not be reviewed at this time.

However, the Court notes that the ALJ's finding, at the fifth step, that Totten "has at least a high school education" is not based on substantial evidence.  The record contains conflicting information about the level of Totten's education.  On October 1, 2007, Silverman reported that Totten "dropped out of school when she became pregnant with her first son at age 17.  She is interested in getting her GED."  (Tr. 332).  Totten's disability report, prepared by "W. Brodeur," on October 4, 2007, states that Totten completed her GED approximately in 1997 and that she attended special education classes from 1994 to 1997 at the Sullivan West Central School District in Jeffersonville, New York.  (Tr. 124, 129).  Dr. Helprin reported in the January 4, 2008 psychiatric evaluation that "[i]n the tenth grade [Totten] was sent to an alternative school due to her pregnancy and fighting but dropped out.  She earned her GED in 1997."  (Tr. 224).  On June 2, 2009, Totten's attorney sent a letter to the ALJ, in which he stated that Totten "obtained a GED in 1995."  (Tr. 198).  The conflicting evidence in the record cannot be accepted by a reasonable mind as forming the basis to support a conclusion that Totten "has at least a high school education," as the ALJ determined.  See Shaw, 221 F.3d at 131.

38

**Remand**

"When there are gaps in the administrative record or the ALJ has applied an improper

legal standard," remand to the Commissioner for further development of the evidence and

application of the proper standard is warranted.  Parker v. Harris, 626 F.2d 225, 235 (2d Cir.

1980).  Here, remand to the ALJ to develop the record and apply the correct legal standards, as

explained above, is appropriate.

## RECOMMENDATION

For the foregoing reasons, I recommend that: (1) the defendant's motion for judgment on

the pleadings, Docket Entry No. 13, made pursuant to Fed. R. Civ. P. 12(c), be denied; (2) the

plaintiff's motion for judgment on the pleadings, Docket Entry No. 15, made pursuant to Fed. R.

Civ. P. 12(c), be denied; and (3) the case be remanded to the Commissioner for further

development of the record and for reconsideration of Totten's disability claim under the correct

applicable standards.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be

filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable

Barbara S. Jones, 500 Pearl Street, Room 1920, New York, New York, 10007, and to the

chambers of the undersigned, 40 Centre Street, Room 540, New York, New York, 10007.  Any

requests for an extension of time for filing objections must be directed to Judge Jones.

FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A

WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  See Thomas v.

Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: New York, New York                    Respectfully submitted:
      March 15, 2011

                                    KEVIN NATHANIEL FOX
                                    UNITED STATES MAGISTRATE JUDGE

40